Alan GROSS, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 11–715C.

United States Court of Federal Claims.

Aug. 21, 2012.

Daniel A. Alterman, Arlene F. Boop, and Doris G. Traub, New York City, for plaintiff.

Daniel G. Kim, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

SWEENEY, Judge.

Plaintiff, an employee of the United States Census Bureau ("Census Bureau"), contends that he is entitled to Sunday premium pay under 5 U.S.C. § 5546(a). He brought this suit on behalf of himself and those similarly situated, and now moves for class certification. For the reasons set forth below, the court denies plaintiff's motion.

### I. BACKGROUND

Plaintiff began his employment with the Census Bureau in October 1990. Since that time, he has worked as a permanent, part-time field representative in the Census Bureau's New York region.[1] As a field representative, plaintiff is responsible for conducting interviews to collect information for various surveys administered by the Census Bureau, including the Current Population Survey ("CPS"), the Consumer Expenditure Quarterly Survey, the Survey of Income and Program Participation, and the National Ambulatory Medical Care Survey. Plaintiff states that he regularly works on Sundays and, in fact, is required to do so.

On May 26, 2009, the United States Court of Appeals for the Federal Circuit ruled, in *Fathauer v. United States*, 566 F.3d 1352

---

**1.** The other regions are headquartered in Atlanta, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Kansas City, Los Angeles, Philadelphia, and Seattle.

that the Sunday premium pay statute, 5 U.S.C. § 5546(a), applied to part-time federal employees. As a result of this ruling, the Census Bureau, in March 2011, sent a notice to its part-time employees at its telephone centers indicating that they were entitled to Sunday premium pay effective May 25, 2003, and provided those employees with access to its computerized records so that they could gather the information necessary to assert a claim for back pay. The Census Bureau did not provide similar notice or records access to any of its approximately 1,734 current permanent, part-time field employees, almost all of whom, plaintiff states, work on Sundays.

Upon discovering that the Census Bureau had notified its part-time office employees that they were entitled to Sunday premium pay, plaintiff made a written demand for Sunday premium pay for the Sundays he had already worked and the Sundays he would work in the future. The Census Bureau acknowledged his claim and requested additional information. Plaintiff forwarded additional information to the Census Bureau and renewed his demand for Sunday premium pay, but the Census Bureau did not act on his claim.

Accordingly, plaintiff filed suit in the United States Court of Federal Claims ("Court of Federal Claims"). He seeks, for himself and all of the Census Bureau's other permanent, part-time field employees, back Sunday premium pay for May 2003 to the present; an order directing the Census Bureau to pay plaintiff and other similarly situated individuals Sunday premium pay going forward; and attorneys' fees. Plaintiff now moves to certify a class pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC"),[2] defining the proposed class as follows:

[A]ll those individuals who worked as part-time field representatives and senior field representatives in the Defendant's Census Bureau at any time from May 26, 20[0]3 to present, who worked on a Sunday as part of a regularly scheduled eight (8) hour period of service which was not overtime work as defined by 5 U.S.C. § [55]42(a) but who were not paid premium pay equal to twenty-five percent (25%) of their hourly rate of basic pay pursuant to 5 U.S.C. § 5546(a) or 5 U.S.C. § 5544(a)(i)[.]

Mot. 1. Defendant opposes the motion. The court deems oral argument unnecessary.

## II. DISCUSSION

▬▬▬▬▬ 23 describes the requirements for maintaining a class action in the Court of Federal Claims:

(a) Prerequisites. One or more members of a class may sue as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. A class action may be maintained if RCFC 23(a) is satisfied and if:

(1) [not used];

(2) the United States has acted or refused to act on grounds generally applicable to the class; and

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a

---

**2.** In several parts of his motion, plaintiff erroneously cites or refers to the requirements of Rule 23 of the *Federal Rules of Civil Procedure* ("FRCP") rather than the requirements of RCFC 23. While subsection (a) of the two rules are nearly identical, RCFC 23(b) is notably different from its counterpart in the federal rules due to the limited relief available in this court. *See* RCFC 23 Rules Committee Note (2002 Revision) ("Because the relief available in this court is generally confined to individual money claims against the United States, the situations justifying the use of a class action are correspondingly narrower than those addressed in FRCP 23. Thus, the court's rule does not accommodate, *inter alia*, the factual situations redressable through declaratory and injunctive relief contemplated under FRCP 23(b)(1) and (b)(2)."). Plaintiff's erroneous citations do not, however, substantially affect his arguments.

class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by class members;
>
> (C) [not used]; and
>
> (D) the likely difficulties in managing a class action.

In other words, a putative class representative must demonstrate: (i) numerosity—that the proposed class is so large that joinder is impracticable; (ii) commonality—that there are common questions of law or fact that predominate over questions affecting individual prospective class members and that the government has treated the prospective class members similarly; (iii) typicality—that his or her claims are typical of the proposed class; (iv) adequacy—that he or she will fairly represent the proposed class; and (v) superiority—that a class action is the fairest and most efficient method of resolving the suit. *Barnes v. United States,* 68 Fed.Cl. 492, 494 (2005). The class action's proponent must satisfy each of the requirements by a preponderance of the evidence. *Messner v. Northshore Univ. HealthSys.,* 669 F.3d 802, 811 (7th Cir.2012) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008)); *see also Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). Moreover, "[t]hese requirements are in the conjunctive; hence, a failure to satisfy any one of them is fatal to class certification." *Barnes,* 68 Fed.Cl. at 494. The court may certify a class only if, "after a rigorous analysis," it finds that the requirements of RCFC 23 have been met. *Gen. Tel. Co. of the Sw. v.*

*Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Plaintiff contends that his proposed class meets the requirements of RCFC 23, while defendant asserts that the proposed class meets none of the requirements. As explained in more detail below, the court concludes that the proposed class only meets some of the rule's requirements. Although a failure to satisfy one requirement is fatal to a motion for class certification, the court addresses all of the requirements for the benefit of the parties in the event that plaintiff chooses to renew his motion at a later time.

## A. Plaintiff's Proposed Class Definition

Before the court discusses plaintiff's failure to satisfy RCFC 23, it must address a deficiency in plaintiff's proposed class definition. The definition fashioned by plaintiff is self-executing—it implies that individuals who opt into the class have already satisfied all of the requirements of the Sunday premium pay statute and leaves no room for doubt that those individuals are entitled to join the class and are entitled to recovery. However, satisfaction of the statutory requirements is an issue that the court must decide during proceedings on the merits, not during the initial stage of class certification.

> The Sunday premium pay statute provides:
> An employee who *performs work during a regularly scheduled 8–hour period of service* which is not overtime work as defined by section 5542(a) of this title a part of which is performed on a Sunday is entitled to pay for the entire period of service at the rate of his basic pay plus premium pay at a rate equal to 25 percent of his rate of basic pay.

5 U.S.C. § 5546(a) (2006) (emphasis added). Similarly, plaintiff proposes that the class include part-time field representatives and senior field representatives employed by the Census Bureau "who worked on a Sunday as part of a regularly scheduled eight (8) hour period of service" without receiving Sunday premium pay. Mot. 1.

 Although plaintiff's definition mirrors the statutory language, the parties dispute whether the Census Bureau's part-time field employees actually perform their work dur-

ing regularly scheduled eight-hour periods of service. Plaintiff, on one hand, contends that there is no question that these employees do so. On the other hand, defendant asserts that whether these employees perform their work during regularly scheduled eight-hour periods of service is a question for the court that requires individualized inquiries. Because the application of this statutory requirement is in dispute, it would be improper for it to be included in the class definition as a fait accompli. The court will not implicitly make a merits ruling by certifying a class. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.... '[T]he question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" (quoting *Miller v. Mackey Int'l, Inc.,* 452 F.2d 424, 427 (5th Cir.1971))).

■ Although plaintiff's proposed class definition is facially flawed, the court declines to deny his motion on this basis. *See King v. United States,* 84 Fed.Cl. 120, 128–29 (2008) (granting a motion to certify a class but modifying substantive and nonsubstantive aspects of plaintiff's proposed class definition to remove its flaws). Instead, to conserve the parties', as well as its own, resources, the court modifies plaintiff's definition to eliminate the contested statutory requirement. Such a modification is well within the court's discretion. *See, e.g., id.; In re Motorola Sec. Litig.,* 644 F.3d 511, 518 (7th Cir.2011) (noting that "a district court has the authority to modify a class definition at different stages in litigation"); *Powers v. Hamilton Cnty. Pub. Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007) (revising the class definition on appeal and noting that "district courts have broad discretion to modify class definitions");

*In re Monumental Life Ins. Co.,* 365 F.3d 408, 414 (5th Cir.2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision."); *Robidoux v. Celani,* 987 F.2d 931, 937 (2d Cir. 1993) ("A court is not bound by the class definition proposed in the complaint and should not dismiss the action simply because the complaint seeks to define the class too broadly."); *see generally* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.21[6] (3d ed. 2011) ("If the court determines that a proposed class description is not sufficiently definite, the court ... may, in its discretion, grant certification but modify the definition of the proposed class to provide the necessary precision or to correct other deficiencies."). The proposed class, as modified, includes "part-time field representatives and senior field representatives employed by the Census Bureau from May 26, 2003, to the present who performed nonovertime work on a Sunday and did not receive Sunday premium pay for that work under 5 U.S.C. § 5546(a)." The court will apply the parties' arguments regarding class certification to this modified proposed class definition.

## B. Numerosity

■ To prevail on his motion for class certification, the first requirement that plaintiff must satisfy is numerosity. RCFC 23(a)(1) specifies that a class action is appropriate only if "the class is so numerous that joinder of all members is impracticable[.]" There is no set number of potential class members that must exist before a court can certify a class. Instead, a court must examine the facts of the case to determine whether the numerosity requirement has been satisfied. *Gen. Tel. Co. of the Nw., Inc. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). In particular, a court should consider the number of potential class members, the geographic dispersal of the potential class members, and the size of each potential class member's claim.[3] *King,* 84

---

3. Other factors courts consider include "the ease of identifying [class] members and ascertaining their addresses" and "the facility of making service on [class members] if joined[.]" *Jaynes v. United States,* 69 Fed.Cl. 450, 454 (2006). Presumably because the identity and last known

address of potential class members in this case can be readily obtained from Census Bureau payroll records, neither party disputes that these two factors weigh in favor of satisfaction of the numerosity requirement.

Fed.Cl. at 123–24; *accord Jaynes*, 69 Fed.Cl. at 454.

■■■ The number of potential class members is considered to be the most important factor of the numerosity requirement. *King*, 84 Fed.Cl. at 124; *Jaynes*, 69 Fed.Cl. at 454; *see generally* 5 Moore, *supra*, at ¶ 23.22[1][b]. While a putative class representative need not provide a precise number of prospective class members, mere speculation is insufficient to satisfy the numerosity requirement. *King*, 84 Fed.Cl. at 124. Also bearing on numerosity—and, therefore, the impracticability of joinder—is the location of the potential class members; joinder is less practicable when potential class members are dispersed geographically. *Id.* at 124–25. Further, the size of prospective class members' individual claims is relevant to the numerosity inquiry because in circumstances where there are numerous prospective claimants with small claims, a class action allows those individuals to pursue their claims without incurring litigation costs that would overwhelm their potential recoveries. *Id.* at 125; *cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (noting that although class certification is not prohibited when numerous potential class members have large claims, the current class action scheme is aimed at vindicating the rights of individuals with small claims).

Turning first to the most important aspect of the numerosity inquiry, plaintiff suggests that the proposed class includes at least 1,734 individuals—the number of part-time field representatives and senior field representatives currently employed by the Census Bureau. Defendant objects to plaintiff's characterization of the size of the proposed class, asserting that plaintiff has not demonstrated how many of the 1,734 current employees actually worked on Sundays. It notes that some of the employees might have worked exclusively on surveys that were conducted during weekday business hours.[4] It also provides declarations from several Census Bureau survey supervisors in the New York region who assigned work to plaintiff indicating that field representatives are not required to work on particular days, are not disciplined for not working on Sundays, may be able to complete their work without working on Sundays, and have their performance reviewed by senior field representatives at mutually convenient times. *See* Decl. of John Baker ¶¶ 6a, 9; Decl. of Juan Herrera ¶¶ 6a, 8; Decl. of Lance Sanchez ¶¶ 6a, 9; *accord* Decl. of Diana Rodriguez ("Rodriguez Decl.") ¶¶ 6a, 9–10 (noting, with respect to field representatives working on the CPS, that their performance reviews are scheduled for Sundays, but may be, and often are, rescheduled for other days; that some choose not to work on Sundays, primarily for religious reasons; that they are not disciplined for not working on Sundays; and that those who do not work on Sundays are instructed to work an entire day on Monday to meet their goals).

In response, plaintiff submits his own testimony and two groups of documents that, from his perspective, demonstrate that Sunday work is and was the norm for part-time field employees. Plaintiff's testimony is presented in two forms: a declaration attached to his motion for class certification and the transcript of a deposition taken for the purpose of his class certification motion. In both the declaration and the deposition, plaintiff asserts that he and other field employees were required to work on Sundays, and actually did work on Sundays. Decl. of Alan Gross ("Gross Decl.") ¶ 3; Gross Dep. *passim*, Apr. 5, 2012. In support of this assertion, he reports that when attending a national training session in November 2011, he spoke with a number of field representatives and senior field representatives, all of whom indicated that they worked on Sundays and were required to do so. Gross Decl. ¶ 13. Among the individuals he spoke with were fifteen to twenty field representatives from the New York region and one to three

---

4. Defendant also remarks that plaintiff has not identified how many former employees exist who meet the proposed class definition. The number of eligible former employees is not particularly relevant to a contention that the proposed class is not sufficiently numerous, however, because to the extent that such former employees exist, they would only serve to increase the number of proposed class members.

field representatives from each of five other regions. Gross Dep. 70:17–20. In other words, plaintiff personally ascertained that other than himself, at least twenty, but no more than forty-five, field employees worked on Sundays.

In addition to his testimony, plaintiff supplies a group of documents that includes a job description and recruiting bulletins for various categories of Census Bureau field personnel. The field representative job description indicates: "Although you will typically have the flexibility to determine the specific hours that you will be working, the work will usually require evening and weekend work to meet deadlines.... You need to be available to work when the people you need to interview are home." Decl. of Arlene F. Boop ("Boop Decl."), Ex. H. And, recruiting bulletins issued by various regional offices indicate that senior field representatives, field supervisors, and field representatives "must" be available or willing to work days, evenings, and weekends and, in the case of senior and supervisory employees, "must be willing to accept all assignments and work multiple surveys." Boop Decl. Ex. I.

The other group of documents supplied by plaintiff relates to the CPS, "a monthly survey of households that collects comprehensive data on demographic and labor force characteristics." Rodriguez Decl. ¶ 7. The CPS begins each month on a Sunday, and field employees in the New York region are, at a minimum, encouraged to work on the first Sunday of the CPS period. *See* Boop Decl. Ex. J at 3 ("All CPS [field representatives] who have cases in their possession are encouraged to work the first Sunday (although this is not a requirement)."), 7 ("All CPS [field representatives] who have cases in their possession are expected to work the 1st Sunday."); *accord* Decl. of Doris G. Traub ("Traub Decl."), Exs. E–H (containing CPS materials from the New York region). CPS materials from other regions also indicate that employees are strongly encouraged to work on the first Sunday of the CPS period. *See* Boop Decl. Exs. K–U (containing CPS materials from the eleven other regions). Indeed, field representatives are advised to

"take advantage of the first day of CPS week by contacting respondents that have agreed to a Sunday interview" and to "[a]ttempt to contact households at the times [they] are most likely to find respondents at home, which includes weekends...." Boop Decl. Ex. J at 3–4. However, in many of the regions, it is recognized that some employees cannot, for personal or religious reasons, work on Sundays and thus those employees are allowed to make up their work on other days. *See, e.g.,* Boop Decl. Ex. P at 2 ("In general, we do not require our field staff to work on Sundays or other faith-based observance days."); Boop Decl. Ex. Q at 2 ("We do have [field representatives] on the program that elect not to work Sunday primarily for personal reasons."). Only one document in the record provides an estimate of the number of field employees who work on Sundays; that document indicates that in the Detroit region, as of July 2008, "the majority of [the senior field representative] teams, and about half of [its] field staff are already working on Sundays" and "requesting that the other fifty percent of [the] field staff work on Sunday as well...." Boop Decl. Ex. Q at 2.

██ Based on the testimony and documents submitted by the parties, it is clear that some part-time field employees work on Sundays. However, plaintiff has not sufficiently demonstrated the number of employees who do. As an initial matter, because plaintiff has not established that working on Sundays is required, rather than strongly encouraged, the court cannot draw what otherwise would be the logical conclusion: that most or all of the 1,734 current employees have worked on Sundays. Although plaintiff testified that Sunday work was required, none of the job descriptions or recruiting bulletins in the record contains a must-work-on-Sundays requirement; they merely advise prospective employees that weekend work—which, without further elaboration, could mean Saturday work or Sunday work or both—would be required. And, while the CPS-related materials in the record reflect that the CPS begins on a Sunday each month and suggest that working on the first Sunday was encouraged, if not strongly encouraged, none of the documents indicates that field

employees assigned to work on the CPS are required to work on Sundays. In fact, many of the CPS materials contain the recognition that some employees do not wish to work on Sundays, for personal or religious reasons. Moreover, as reflected in the declarations submitted by defendant, survey supervisors in the New York region deny that field representatives are required to work on Sundays.

In addition to failing to establish that field employees are required to work on Sundays, plaintiff has provided very little evidence indicating how many field employees actually worked on Sundays. His testimony reflects that he personally knows of twenty to forty-five field employees who work on Sundays; a document from the Detroit region indicates that as of July 2008, about one-half of an unknown number of field employees work on Sundays;[5] and defendant notes that there are currently 1,734 part-time field employees. Thus, the evidence before the court suggests that the class could contain as few as twenty members or as many as 1,734 members. The court recognizes that these figures are imprecise. The lower limit likely would be more than twenty if the field employees from the Detroit region who worked on Sundays are included. In addition, the upper limit would be less than 1,734 if the number of current part-time field employees who do not work on Sundays are excluded. And, the upper limit would increase by the number of former field employees who worked on Sundays. However, because neither party provided any evidence—either hard data or estimates—regarding the number of individuals who fit within these three categories, the court must use the only figures available. And, while plaintiff would like the court to conclude that the number is on the higher end of the 20–to–1,734 range, he has provid-

ed very little evidence that would allow the court to draw that conclusion.

Without a reliable estimate of the number of individuals who might become members of plaintiff's proposed class, the court cannot determine whether the number of proposed class members is sufficiently numerous to render joinder impracticable. Therefore, there is no need to address the other numerosity considerations: the geographic dispersal of the potential class members and the size of potential class members' individual claims. Nevertheless, the court notes that the potential class members are employed by twelve Census Bureau offices located throughout the United States, rendering joinder less practicable. It also notes that plaintiff has not presented any evidence regarding the size of the individual claims, but merely asserts that each claim may be too small to pursue independently of the others. *See* Gross Decl. ¶ 14. Thus, the court cannot ascertain whether prospective class members would be unable or unwilling to pursue their claims individually due to their size.

In sum, plaintiff has not met his burden of satisfying, by a preponderance of the evidence, the numerosity requirement.[6]

### C. Commonality

The next requirement, commonality, comprises three separate inquiries. First, are there factual or legal issues common to the proposed class? RCFC 23(a)(2). Second, do these common issues predominate over issues that are not common to the proposed class? RCFC 23(b)(3). And third, has the government acted or refused to act on grounds applicable to the entire proposed class? RCFC 23(b)(2). In analyzing whether the commonality requirement has been satisfied, "the court must, where necessary, look beyond the pleadings, and seek to develop an understanding of the relevant claims,

---

5. Assuming that each of the twelve regions employs the same number of field employees, approximately 144 field employees work in the Detroit region. Thus, based on this document, approximately seventy-two of the Detroit region's field employees worked on Sundays as of July 2008. However, the court has no basis for its assumption regarding the number of field employees who work at each office, and therefore cannot draw any conclusions regarding the num-

ber of the field employees in the Detroit region who work on Sundays.

6. It should not be difficult for plaintiff to establish numerosity after discovery, because the number of part-time field representatives and senior field representatives who worked on Sundays, as well as the size of their claims, is likely to be readily ascertainable through a review of Census Bureau records.

defenses, facts and substantive law." *Barnes,* 68 Fed.Cl. at 494.

### 1. Common Issues

 To establish the existence of a common factual or legal issue, the claims of each potential class member "must depend upon a common contention" that "is capable of classwide resolution[.]" *Wal–Mart Stores, Inc.,* 131 S.Ct. at 2551; *see also King,* 84 Fed.Cl. at 126 (agreeing that " 'commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members.' " (quoting *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir.2001))); *Barnes,* 68 Fed.Cl. at 496 ("[T]he questions underlying the claims of the class merely must share essential characteristics, so that their resolution will advance the overall case."). A common contention can be resolved for the entire class if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc.,* 131 S.Ct. at 2551. Only one significant common contention capable of classwide resolution is necessary to satisfy the common-issue component of the commonality requirement. *See Barnes,* 68 Fed.Cl. at 496 n. 6.

Here, both parties agree, the claims of each putative class member depend on the contention that part-time field employees perform their work during regularly scheduled eight-hour periods of service and are therefore entitled to Sunday premium pay under 5 U.S.C. § 5546(a) for nonovertime work they performed on Sundays.[7] Defendant, however, argues that the truth or falsity of this contention cannot be determined on a classwide basis. Instead, it asserts, to make such a determination, the court would be required to conduct a fact-intensive inquiry for each member of the class that takes into account the differences (1) between field representatives and senior field representatives; (2) in the management of the various surveys; (3) in the management of each survey among regions; and (4) in the circumstances of the work done on each Sunday, *i.e.,* whether it was performed during a regularly-scheduled eight-hour period of service.[8] In other words, defendant argues that determining the validity of the common contention requires , not generalized, proof.

[13] The common contention identified by the parties is a mixed issue of law and fact: before the court can consider whether the putative class members meet the statutory requirements for Sunday premium pay—*i.e.,* whether they performed nonovertime work on a Sunday "during a regularly scheduled 8–hour period of service"—it must determine what constitutes a "regularly scheduled 8–hour period of service...." Plaintiff, citing various statutes, regulations, and guidelines, asserts that the phrase "regularly scheduled 8–hour period of service" essentially means any period of time in which work is per-

7. Defendant states that it "recognizes that there is a common legal issue for this Court to decide regarding plaintiff and members of the putative class—namely, whether they were 'regularly scheduled' to work Sundays on or after May 26, 2003." Def.'s Resp. 10. Plaintiff similarly states that "the determinative issue is whether the [field representatives] and [senior field representatives] work Sundays 'as part of a regularly scheduled' work period." Pl.'s Reply 10.

8. Defendant frames its argument as contesting plaintiff's satisfaction of the predominance aspect of the commonality requirement. However, in *Wal–Mart Stores, Inc.,* the United States Supreme Court held that the common-issue requirement in FRCP 23(a)(2)—identical to the common-issue requirement in RCFC 23(a)(2)—must be *resolvable* on a classwide basis. 131 S.Ct. at 2551. Indeed, in response to the dissent's accusation that it was confounding the common-issue requirement with the predominance requirement, the majority explained that it was considering dissimilarities among the putative class members "not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate,* but in order to determine (as Rule 23(a)(2) requires) whether there is '[e]ven a single [common] question.' " *Id.* at 2556 (quoting Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action,* 103 Colum. L.Rev. 149, 176 n. 110 (2003)). Thus, defendant, by arguing that the common question—whether part-time field employees perform their work during regularly scheduled eight-hour periods of service and are therefore entitled to Sunday premium pay under 5 U.S.C. § 5546(a)—cannot be resolved for the class as a whole, is actually attacking the existence of a common issue in the first instance, and not whether that issue predominates.

formed by a permanent employee or in which a permanent employee must be available to perform work, while defendant, quoting 5 C.F.R. § 550.103, asserts that the phrase refers to work "scheduled in advance of an administrative workweek under an agency's procedures for establishing workweeks[.]" [9] Defining this phrase—a matter of statutory interpretation—is a necessary prerequisite to determining the types of proof necessary to apply the phrase to the putative class. For example, if the phrase refers to any permanent employee, and nothing more, then the fact-intensive inquiries suggested by defendant would not be necessary. On the other hand, if the phrase refers to eight-hour shifts that have been scheduled in advance, then evidence regarding how the various regions scheduled the shifts for the various surveys may be necessary.

Accordingly, ascertaining what constitutes a "regularly scheduled 8–hour period of service" is a threshold legal inquiry with respect to any claim by Census Bureau field employees for Sunday premium pay. It necessarily follows that the court's determination of the truth or falsity of plaintiff's proposed definition of "regularly scheduled 8–hour period of service" would resolve a common contention central to every prospective class member's claim. Therefore, the contention is capable of classwide resolution. Because plaintiff need only establish the existence of one common contention, its proposed class satisfies the common-issue component of the common-■■ requirement.

### 2. Predominance

[14] Having established the existence of a common legal issue, the court must next determine whether that issue predominates over issues that are not common to the class. This predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation" and "is far more demanding" than the initial common-issue inquiry. *Amchem Prods., Inc.*, 521 U.S. at 623–24, 117 S.Ct. 2231. Common issues—those in which the same evidence

could be used by each member of the class to make a prima facie showing—predominate over individual issues—those in which each member of the class must present individualized evidence to make a prima facie showing—if they " 'are more substantial than the issues subject only to individualized proof.' " *Jaynes*, 69 Fed.Cl. at ■■ (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.2002)).

[15] In this case, each putative class member must establish (1) what constitutes a "regularly scheduled 8–hour period of service"; (2) whether he or she performed non-overtime work on a Sunday after May 26, 2003, "during a regularly scheduled 8–hour period of service"; and (3) the amount of Sunday premium pay to which he or she is entitled. As noted above, resolution of the first issue can be accomplished on a class-wide basis. However, it has yet to be determined whether generalized proof is sufficient to resolve the second issue. The types of proof necessary to establish whether a part-time field employee performed Sunday work "during a regularly scheduled 8–hour period of service" depends on how that phrase is defined; depending on the definition, the proposed class may rely on generalized evidence, or each part-time field employee may need to present individualized evidence based on his or her particular circumstances. In other words, the extent of the individualized inquiries that will be needed in this case is currently unknown.

The court has previously confronted a situation where the resolution of a common legal issue would affect whether individualized proof was necessary to resolve other issues. In *Fisher v. United States*, the plaintiff sought a refund of taxes he paid as a result of the sale of stock he received upon the demutualization of a life insurance company. 69 Fed.Cl. 193, 194–95 (2006). He sought to certify a class of similarly situated taxpayers, *id.* at 195–96, contending that "the claim of every prospective class member present[ed] the common issue of the correct tax basis of

---

9. The parties spend much of their briefs addressing the definition of the term "regularly scheduled" and whether plaintiff and his colleagues performed work on Sundays during "regularly scheduled 8–hour period[s] of service...." As noted above, these are questions on the merits of plaintiff's complaint and should not be resolved in a motion for class certification.

stock or cash received in demutualization transactions," *id.* at 204. The government argued that class certification was not appropriate because "[i]n a tax refund action the taxpayer's entire tax liability under the particular tax return is open for redetermination" and thus each taxpayer's liability would need to be addressed individually. *Id.* at 202. The court agreed that the redetermination of a taxpayer's liability involved "individualized determinations that would likely not be appropriate for class treatment." *Id.* at 204. Nevertheless, it recognized that "regardless of individual offsets, resolution of [the tax basis issue would] substantially affect all prospective plaintiffs' claims." *Id.* Noting that resolution of the common legal issue in the government's favor would preclude the need for individualized evidence, the court suggested that it could proceed under RCFC 23(c)(4) by certifying a class for the limited purpose of resolving the common legal issue, and then decertifying the class if individualized determinations became necessary. *Id.* It did not, however, take this course of action. *Id.* at 204–05.

Here, the court is not prepared to invoke RCFC 23(c)(4); plaintiff has neither satisfied all of the remaining requirements for class certification nor requested certification for the limited purposes of defining the relevant statutory phrase. Nevertheless, it will not foreclose plaintiff from requesting this course of action if circumstances later warrant it.

In sum, it is impossible at this time to determine whether the common legal issue predominates over individualized issues. Plaintiff, therefore, has not met his burden to establish the predominance element of the commonality requirement by a preponderance of the evidence.

### 3. Similar Treatment

The final aspect of the commonality requirement is whether the government has "acted or refused to act on grounds generally applicable to the class." RCFC 23(b)(2). Plaintiff contends that the Census Bureau requires, or at least strongly encourages, all of the prospective class members to work on Sundays, but fails to compensate those efforts with Sunday premium pay. Defendant responds that plaintiff has not established that the Census Bureau requires the putative class members to work on Sundays. It also contends that plaintiff has not shown that the Census Bureau categorically refuses to pay the putative class members Sunday premium pay on the same grounds, suggesting that any such refusal is dependent on the individual circumstances of each part-time field employee.

Defendant's interpretation of the act-or-refusal-to-act requirement is too narrow. The evidence before the court reflects that the Census Bureau does not consider part-time field employees to be eligible for Sunday premium pay. Plaintiff does not receive Sunday premium pay, Gross Decl. ¶¶ 7–8, 12; Gross Decl. Exs. A–B; plaintiff does not believe that other part-time field employees receive Sunday premium pay, Gross Decl. ¶¶ 7–8, 12–13; and the Census Bureau did not notify its part-time field employees, as it did with its other part-time employees, that they were eligible for Sunday premium pay, *id.* ¶ 9; Traub Decl. Ex. C; *accord* Answer ¶¶ 15–16, 18. Defendant provides no evidence suggesting that part-time field employees were deemed ineligible for Sunday premium pay based on their individual circumstances, such as the region in which they worked or the surveys that they conducted. Accordingly, plaintiff has sufficiently established, by a preponderance of the evidence, that the Census Bureau has refused to pay Sunday premium pay to its part-time field employees on the common ground that those employees are ineligible for such pay. However, because he did not establish the predominance of the common legal issue, plaintiff has not satisfied the overarching commonality requirement.

### D. Typicality

The third general requirement for maintaining a class action is that the claims of the proposed class representative be typical of the claims of the other prospective class members. In many ways, the typicality requirement is similar to the commonality requirement: "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so in-

terrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of the Sw.*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364. Nevertheless, typicality and commonality are distinct requirements. Typicality is demonstrated "when 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Barnes*, 68 Fed.Cl. at 498 (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir.1992)). It "may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class, provided that the named representatives' claims share the same essential characteristics as the claims of the class at large." *Fisher*, 69 Fed.Cl. at 200 (citing *Piazza v. EBSCO Indus., Inc.*, 273 F.3d 1341, 1351 (11th Cir. 2001)).

■ Here, the claims of each potential class member arise from the same course of action: the Census Bureau's failure to pay them Sunday premium pay. And, all of the potential class members would make a similar legal argument regarding their entitlement to Sunday premium pay: that they performed nonovertime work on Sundays "during a regularly scheduled 8–hour period of service...." It may turn out, as defendant argues, that the phrase "regularly scheduled 8–hour period of service" will apply to the putative class members in different ways, depending on their job title, region, or surveys worked. However, these possible differences do not detract from the shared essential characteristics of their claims. Accordingly, plaintiff has satisfied, by a preponderance of evidence, the typicality requirement.

### E. Adequacy

In addition to establishing numerosity, commonality, and typicality, a putative class representative must establish that he or she will "fairly and adequately protect the interests of the class." RCFC 23(a)(4). There are two aspects to the adequacy requirement: the existence of conflicts between the putative class representative and the remainder of the proposed class, and the qualifications and capabilities of proposed class counsel. *Amchem Prods., Inc.*, 521 U.S. at 625–26 & n. 20, 117 S.Ct. 2231; *Gen. Tel. Co. of the Sw.*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364; *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 404–05, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

### 1. Conflicts of Interest

With respect to the first component of the adequacy requirement, defendant contends that plaintiff's interests may be antagonistic to others in the proposed class. Citing plaintiff's representations that approximately six potential class members fear losing their jobs if they file suit against the Census Bureau for Sunday premium pay, Gross Decl. ¶ 15; Gross Dep. 74:12–76:10, defendant argues that the interests of these potential class members may diverge from the interests of plaintiff. However, defendant does not explain, and the court cannot determine, precisely how their interests would diverge as a result of their fear.

■ Only one type of class action may be maintained in the Court of Federal Claims— an opt-in class action. RCFC 23(c)(2)(B)(iv)– (v); *Bright v. United States*, 603 F.3d 1273, 1277 & n. 1 (Fed.Cir.2010). It is well settled that in an opt-in class action, only those individuals who affirmatively choose to join the class are bound by the outcome. *See, e.g., Jaynes*, 69 Fed.Cl. at 460; *Buchan v. United States*, 27 Fed.Cl. 222, 223 (1992). Accordingly, an individual who chooses not to opt into a class action in the Court of Federal Claims does not lose any legal rights as a result of that decision. And, nothing that the class representative alleges, argues, wins, or loses has any effect on individuals who are not members of the class. Thus, it would be impossible for plaintiff's interests in pursuing this suit to diverge from the interests of nonparticipating individuals. Moreover, to the extent that defendant is arguing that plaintiff's interests may diverge from the interests of reluctant individuals who ultimately choose to join the class, this concern is also unfounded. The court can think of no reason, and defendant has not provided one, why a class member's interests would diverge from the interests of the class repre-

sentative merely because the class member was initially hesitant to join the class.

In sum, there is a preponderance of evidence supporting, under the first component of the adequacy requirement, the absence of a conflict of interest between plaintiff and the other prospective members of the class.

## 2. Proposed Class Counsel

The second component of the adequacy requirement focuses on the experience and competence of proposed class counsel. Before the court can appoint class counsel, it "must consider":

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class[.]

RCFC 23(g)(1)(A). In addition, it "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" RCFC 23(g)(1)(B). Although defendant does not challenge the experience or qualifications of plaintiff's counsel, the court must satisfy itself that the appointment of plaintiff's counsel as class counsel would be in the best interests of the class. RCFC 23(g)(2).

Plaintiff has retained two law firms to represent him in this matter: Alterman & Boop, LLP and Traub & Traub, P.C. Daniel

L. Alterman is plaintiff's attorney of record, and he is assisted by his partner, Arlene F. Boop, and a partner at the other firm representing plaintiff, Doris G. Traub.[10] In support of the appointment of his attorneys as class counsel, plaintiff submitted a declaration from Ms. Traub describing the qualifications and experience of all three attorneys.

According to Ms. Traub, each attorney has extensive experience in litigating employment cases. Mr. Alterman has over forty years of experience litigating such cases, including multiparty cases in state and federal court. Traub Decl. ¶ 21. Ms. Boop has over thirty-five years of similar experience. *Id.* Their law firm has served as class counsel in two federal employment suits: *Sheppard v. Consolidated Edison Co.,* No. 1:94-cv-00403 (E.D.N.Y.), and *Hardy v. Daily* News, No. 82-cv-3662 (S.D.N.Y.). *Id.* The former suit "resulted in both equitable and compensatory relief" for the class and the latter was a "complex multi-party discrimination case . . ."[11] *Id.* Further:

Mr. Alterman is an elected member of the College of Labor and Employment. Both Mr. Alterman and Ms. Boop are members of the National Employment Lawyers Association (NELA) and its local affiliate as well as other Bar Associations and both have frequently lectured, or in the case of Mr. Alterman served as adjunct counsel, in the area of employment law.

*Id.* Ms. Traub, for her part, has spent twenty-five years engaged in employment litigation, with an emphasis on representing feder-

---

**10.** RCFC 83.1(c)(1) specifies that "[a] party may have only one attorney of record in a case at any one time," and all other attorneys "assisting the attorney of record must be designated 'of counsel.'" The rule contains no exceptions for class actions. Thus, in the event that a class is certified in this case, plaintiff will be required to designate one of his attorneys as the official class counsel. *See, e.g., King,* 84 Fed.Cl. at 129.

**11.** Ms. Traub did not provide any additional details regarding these cases upon which the court could gauge their relevance or complexity. With respect to *Sheppard,* a review of the docket of the United States District Court for the Eastern District of New York and contemporaneous news articles reflects that the suit lasted eight years, involved approximately 2,400 African–American employees alleging racial discrimination in job

promotions, and resulted in a multi-million-dollar settlement. *See, e.g.,* Joshua Robin, *Con Ed Settles Bias Suit,* Newsday, Sept. 10, 2002, at A17. With respect to *Hardy,* contemporaneous news articles reflect that the suit involved four African–American journalists alleging racial discrimination in job promotions, resulted in a jury verdict in plaintiffs' favor, and culminated in an undisclosed settlement, speculated to include a damages award of several million dollars and monitoring by the Equal Employment Opportunity Commission. *See, e.g.,* Alex S. Jones, *Accord Settles Bias Damages at Daily News,* N.Y. Times, June 11, 1987, at B1. The suit was "the first race discrimination suit brought by editorial employees of a large newspaper to go before a jury." *Id.*

al employees with discrimination, reprisal, wrongful separation, retirement, pay, and other claims. *Id.* ¶ 19. She has represented federal employees in federal court and before various administrative agencies. *Id.* In addition, she is a member of the National Employment Lawyers Association, serves on the board of the association's local affiliate, and provides other attorneys with continuing legal education regarding the representation of federal employees. *Id.* ¶ 20.

 The court is satisfied that the three attorneys representing plaintiff collectively have the knowledge and experience required to represent the class. And, although plaintiff does not describe his attorneys' efforts in identifying or investigating potential claims, it is clear from plaintiff's filings that they have expended more than a minimal amount of time and resources researching their client's allegations. However, plaintiff fails to address the resources his attorneys intend to commit to representing the class. He indicates that two firms and three attorneys are involved, but gives no indication of the size and resources of each firm or the extent of each firm's and each attorney's involvement. The court is required to consider the resources of proposed class counsel before it can make an appointment. RCFC 23(g)(1)(A); *Fisher,* 69 Fed.Cl. at 201. Thus, the absence of such information means that plaintiff has not satisfied, by a preponderance of the evidence, the second element of the adequacy requirement.[12] Therefore, plaintiff has not demonstrated that he would fairly and adequately represent the class.

### F. Superiority

 The final requirement to maintain a class action is superiority; in other words, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy."[13] RCFC 23(b)(3). This requirement is met if the prospective class representative establishes that "a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." FRCP 23 Advisory Committee Note (1966 Amendment), *quoted in Amchem Prods., Inc.,* 521 U.S. at 615, 117 S.Ct. 2231. Among the factors to consider in determining superiority are (1) the potential "class members' interests in individually controlling the prosecution of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by class members"; and (3) "the likely difficulties in managing a class action." RCFC 23(b)(3). "Essentially, under this prong of the analysis, the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action." *Barnes,* 68 Fed.Cl. at 499.

 Plaintiff asserts that each of the factors set forth in RCFC 23(b)(3) supports his motion to certify a class in this suit. In assessing the first factor, a court must determine "whether the class members would pursue their individual claims if the class were not certified." *Fisher,* 69 Fed.Cl. at 205; *see also Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); *Curry v. United States,* 81 Fed.Cl. 328, 338 (2008) (noting that "one of the main justifications for class actions" is the existence of numerous claims that "are too small to justify being brought individually").

---

**12.** If plaintiff chooses to renew his motion for class certification, he should have little difficulty in establishing the adequacy of his attorneys' resources if he provides the required information.

**13.** There are several other methods of adjudicating the claims of multiple individuals arising from the same course of conduct: the permissive joinder of parties under RCFC 20; the filing of a directly related case under RCFC 40.2(a); and consolidation under RCFC 42(a). Procedurally, RCFC 20 requires a motion to amend the complaint to join new plaintiffs, while RCFC 40.2(a) and RCFC 42(a) require the filing of separate complaints.

Plaintiff makes two assertions that are relevant to this factor, both of which the court has already mentioned. First, plaintiff contends that claims of potential class members may be too small to pursue independently of the others. Gross Decl. ¶ 14. Second, plaintiff contends that approximately six potential class members fear losing their jobs if they file suit against the Census Bureau. *Id.* ¶ 15; Gross Dep. 74:12–76:10. Neither assertion supports a finding of superiority. Plaintiff has provided no evidence—not even a ballpark estimate—regarding the amounts of the claims that he or other prospective class members might assert. Thus, at this point, it is reasonable to assume that some, or even all, of the recoveries might be large enough to pursue independently. Moreover, it is irrelevant that six (or any number of) employees would not file suit separately for fear of losing their jobs. Participation in class action suits in the Court of Federal Claims requires each potential class member to affirmatively opt into the class, thereby providing the Census Bureau with notice that the individual is participating in the suit. An employee's fear of losing his or her job is therefore unlikely to be different in the class action context.

Although plaintiff has not provided sufficient evidence regarding potential class members' interests in individually pursuing their claims, he does adequately address the second factor—the existence of prior litigation. Plaintiff explains that the only case similar to his own is a suit filed in this court two weeks before his suit: *Jones v. United States*, No. 77–681. According to plaintiff, *Jones* concerns claims for Sunday premium pay for part-time federal employees, but is intended to cover employees already found eligible for Sunday premium pay and who began receiving such pay post-*Fathauer*. Traub Decl. ¶¶ 23–24. No part-time Census Bureau field employee, plaintiff contends, filed suit before he did. Thus, there appears to be no pending litigation that would prevent this case from proceeding as a class action.

In contrast to the first two factors, plaintiff offers no evidence or argument regarding the third factor, "the likely difficulties in manag-ing a class action," but, in light of his motion, the court presumes that it is plaintiff's position that a class action is manageable in the circumstances presented in this case. Manageability refers to "the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, 417 U.S. at 164, 94 S.Ct. 2140. The Court of Federal Claims has, over the last few years, certified several classes in civilian pay cases, which suggests that such class actions are manageable. *See, e.g., King*, 84 Fed.Cl. at 120; *Curry*, 81 Fed.Cl. at 328; *Barnes*, 68 Fed.Cl. at 492. Despite this fact, defendant contends that managing a class in this case would be prohibitively difficult because adjudication of the putative class members' claims would require individualized determinations of their eligibility for Sunday premium pay and the amount of pay, if any, to which they are entitled. Defendant's contention may have merit. Extensive individualized analyses would render a class action unwieldy. However, as noted above, most of the individualized analyses contemplated by defendant may not be necessary. If eligibility for Sunday premium pay can be determined on a classwide basis (because of the way in which the phrase "regularly scheduled 8–hour period of service" is defined), then the only individual determination that might be required, if eligibility is established, is the amount of Sunday premium pay each class member would receive. Because a necessary threshold issue—how to determine eligibility for Sunday premium pay—has not been resolved, it is not yet possible to ascertain the difficulties in managing a class in this case.

In sum, plaintiff has not established by a preponderance of the evidence that a class action would be superior to other methods of adjudicating the Census Bureau field employees' Sunday premium pay claims. Indeed, given the uncertainties regarding how this case will proceed upon resolution of the threshold legal issue, it is not possible to determine at this time whether a class action is the superior means of resolving the claims of plaintiff and the other Census Bureau field employees. The court cannot perform a cost-benefit analysis without knowing all of the obstacles to converting this suit into a class action.

## III. CONCLUSION

As set forth above, plaintiff has not met all of the requirements set forth in RCFC 23 for maintaining a class action. In particular, he has not satisfied the numerosity and superiority requirements, and he has failed to satisfy elements of the commonality and adequacy requirements. Each of plaintiff's failures is fatal to his motion, but none prevents plaintiff from renewing his motion if circumstances later warrant doing so. Accordingly, the court **DENIES** plaintiff's motion for class certification without prejudice. In a contemporaneously filed order, the court lifts the stay of proceedings and sets forth a revised discovery schedule.

**IT IS SO ORDERED.**